UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

WILLIAM MELVIN WHITE,

      Petitioner,

v.                                    CASE NO. 6:07-cv-1834-Orl-37DAB

SECRETARY, DEPARTMENT OF
CORRECTIONS, et al.,

      Respondents.

_____/

**<u>ORDER</u>**

      This case is before the Court on the Petition for Habeas Corpus Relief (Doc. No. 1), filed by William Melvin White.   Pursuant to the instructions of the Court, Respondents filed a response (Doc. No. 20) to the Petition for Writ of Habeas Corpus, arguing that the petition should be dismissed as time-barred.  After allowing the parties to take a deposition and to file further arguments on the matter, the Court entered an Order (Doc. No. 42) finding that the AEDPA period was equitably tolled from September 26, 2007, through November 19, 2007, and that the petition was timely filed.

      Respondents thereafter filed a response to the merits of Petitioner's claims (Doc. No. 48), and Petitioner filed a reply to the response (Doc. No. 53).   As discussed hereinafter, the habeas petition will be denied.

## I.      STATEMENT OF THE FACTS

The facts adduced at trial, as set forth by the Supreme Court of Florida, are as follows:

> White was a member of a Kentucky chapter of the Outlaws, a motorcycle gang, but was visiting the Orlando chapter.  A group of the Outlaws, accompanied by some girl friends, visited an Orlando nightclub where they met Gracie Mae Crawford.  Gracie Mae accompanied some of the Outlaws back to their Orlando clubhouse. Soon after returning to the clubhouse, White retired to a bedroom with his girl friend.  Sometime thereafter White was called by Richard DiMarino who stated that Crawford liked blacks and that they had to teach her a lesson.  White dressed and went into the kitchen area where he joined DiMarino and Guy Ennis Smith in severely beating Crawford.  Whether DiMarino or White led the assault is unclear, but one witness testified of White's hitting Crawford with his fist and knocking her to the floor.  After the beating, DiMarino and White placed Crawford in the middle of the front seat of White's girl friend's car.  White started driving but along the way stopped the car and DiMarino drove the car to the end of a deserted road.  (The victim, White and DiMarino had done a lot of drinking that evening, but White's girl friend testified that he knew what he was doing.)  After they stopped the car, DiMarino and White pulled Crawford from the car, passed her over a barbed wire fence, and laid her on the ground.  White then straddled her, took out his knife, stabbed her fourteen times and slit her throat.  He handed the knife to DiMarino who also cut her throat.  Crawford died as a result of the wounds inflicted upon her.

> While leaving the area White and DiMarino ran out of gas at the Seaworld parking lot and were later identified by Seaworld security guards who had given them gas.  White and DiMarino went back and picked up the body of the deceased and thereafter discarded it at a different place.  The body was discovered that afternoon.

*White v. State*, 415 So. 2d 719, 720 (Fla. 1982).

## II.     Procedural History

Petitioner was charged by indictment with first degree murder.  Ex. A-8 at 1376.[1] On October 30, 1978, the jury found Petitioner guilty as charged of first degree murder. *See* Ex. A-9 at 1582.  Following the penalty phase, the jury unanimously recommended death, and Judge Frederick T. Pfeiffer sentenced Petitioner to death.  *Id*. at 1638.

On direct appeal, Petitioner raised nine claims.  Ex. A-12.  The Supreme Court of Florida affirmed the conviction and sentence on April 1, 1982.  *White v. State*, 415 So. 2d 719 (Fla. 1982).  The Supreme Court of the United States denied Petitioner's petition for writ of certiorari.  *White v. Florida*, 459 U.S. 1055 (1982).

On October 14, 1983, Petitioner filed a motion to vacate judgment and sentence, which he later amended and supplemented.[2]  Ex. E-6 at 475.  The trial court held an evidentiary hearing on the matter and ultimately considered twenty-one claims.  Ex. E-8 at 1062.  The trial court denied the motion, finding that none of the claims was meritorious.

---

[1]References to the record will be made by citing to the particular volume and page of the advanced appendix.  For example, "Ex. A-1 at 1" refers to page one of the volume labeled Exhibit A-1.

[2]While the motion was pending in the trial court, Petitioner filed a habeas petition with the Supreme Court of Florida, arguing that he was entitled to relief based on *Hitchcock v. Dugger*, 481 U.S. 393 (1987), because the standard jury instructions given at his trial restricted mitigating circumstances to those set forth in the sentencing statute.  The trial court stayed further proceedings in the postconviction motion until final disposition of the habeas petition.  The Supreme Court of Florida denied the petition.  *White v. Dugger*, 523 So.2d 140, 140 (Fla. 1988).  The Supreme Court of the United States denied Petitioner's petition for writ of certiorari.  *White v. Dugger*, 488 U.S. 871 (1988).

On appeal, Petitioner raised eight claims, *see* Ex. E-12, and the Supreme Court of Florida affirmed the trial court's judgment denying relief as to Petitioner's guilt phase claims but reversed the trial court's judgment denying relief as to the Petitioner's sentence based on the *Hitchcock* claim. *White v. State*, 729 So. 2d 909 (Fla. 1999). The case was remanded with directions that the trial court conduct a new sentencing proceeding before a jury.

On November 17-19, 1999, the trial court conducted a new penalty phase at which the State and Petitioner presented evidence to the jury. On November 19, 1999, the jury, by a vote of ten to two, recommended that the trial court impose the death penalty. Ex. F-17 at 327. The trial court subsequently conducted a hearing pursuant to *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).[3] After hearing all of the evidence, the trial court followed the jury's recommendation and sentenced Petitioner to death. Ex. F-17 at 484. The trial court found four aggravating factors: (1) Petitioner was previously convicted of another felony involving the use or threat of violence to the person; (2) the capital felony was committed while Petitioner was engaged in the commission of a kidnapping; (3) the capital felony was especially heinous, atrocious, or cruel; and (4) the capital felony was committed to disrupt or hinder the enforcement of laws. In

---

[3]A *Spencer* hearing occurs after the jury has recommended a sentence but before the judge imposes a sentence. *Kormondy v. Sec'y, Florida Dept. of Corr.*, 688 F.3d 1244, 1271 (11th Cir. 2012). The purpose of a *Spencer* hearing is as follows: "a) give the defendant, his counsel, and the State, an opportunity to be heard; b) afford, if appropriate, both the State and the defendant an opportunity to present additional evidence; c) allow both sides to comment on or rebut information in any presentence or medical report; and d) afford a defendant an opportunity to be heard in person." *Id.*

mitigation, the court found one statutory mitigator and several nonstatutory circumstances.

On appeal, Petitioner raised five claims.  Ex. F-19.  The Supreme Court of Florida affirmed the sentence of death on April 4, 2002.  *White v. State*, 817 So. 2d 799 (Fla. 2002). The Supreme Court of the United States denied Petitioner's petition for writ of certiorari.  *White v. Florida*, 537 U.S. 699 (2002).

On December 16, 2003, Petitioner filed a motion to vacate judgment and sentence, raising twelve claims.  Ex. H-1 at 1.  The trial court held an evidentiary hearing as to the second part of claim five.  After the hearing, the trial court entered an order on August 1, 2005, denying Petitioner's request for postconviction relief.  Ex. H-2 at 213.

Petitioner appealed the denial and raised nine claims.  Ex. H-5.  The Supreme Court of Florida affirmed the denial of the postconviction motion.  *White v. State*, 964 So. 2d 1278 (Fla. 2007).

## III.  GOVERNING LEGAL PRINCIPLES

Because Petitioner filed his petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Henderson v. Campbell*, 353 F.3d 880, 889-90 (11th Cir. 2003).  The AEDPA "establishes a more deferential standard of review of state habeas judgments," *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001), in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002);

*see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (recognizing that the federal habeas court's evaluation of state-court rulings is highly deferential and that state-court decisions must be given the benefit of the doubt).

## A.    Standard of Review Under the AEDPA

Pursuant to the AEDPA, habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The phrase "clearly established Federal law," encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider." *Maharaj v. Secretary for Dep't. of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005).  The meaning of the clauses was discussed by the Eleventh Circuit Court of Appeals in *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001):

Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts.  Under the 'unreasonable application'

clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

If the federal court concludes that the state court applied federal law incorrectly, habeas relief is appropriate only if that application was "objectively unreasonable." *Id*.

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  A determination of a factual issue made by a state court, however, shall be presumed correct, and the habeas petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.  *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e)(1).

## B.    Standard for Ineffective Assistance of Counsel

The United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance: (1) whether counsel's performance was deficient and "fell below an objective standard of reasonableness"; and (2) whether the deficient performance prejudiced the defense.[5]  *Id*. at 687-88.  A court must adhere to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  *Id*. at 689-90.  "Thus, a

---

[5]In *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), the United States Supreme Court clarified that the prejudice prong of the test does not focus solely on mere outcome determination; rather, to establish prejudice, a criminal defendant must show that counsel's deficient representation rendered the result of the trial fundamentally unfair or unreliable.

court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. at 690; *Gates v. Zant*, 863 F.2d 1492, 1497 (11th Cir. 1989).

As observed by the Eleventh Circuit Court of Appeals, the test for ineffective assistance of counsel:

> has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. Courts also should at the start presume effectiveness and should always avoid second guessing with the benefit of hindsight. *Strickland* encourages reviewing courts to allow lawyers broad discretion to represent their clients by pursuing their own strategy. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992) (citation omitted). Under those rules and presumptions, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

## IV.   MERITS OF THE PETITION

### A.   Claim One

*1.     Petitioner's Allegations and the Disposition of this Claim by the State Courts*

Petitioner claims that, at the guilt phase of the trial, the State offered testimony in violation of *Brady*[4] and *Giglio*.[5] It appears that Richard DiMarino, Petitioner, and Guy

---

[4]*Brady v. Maryland*, 373 U.S. 83 (1963).

[5]*Giglio v. United States*, 405 U.S. 150 (1972).

Ennis Smith were all indicted for the murder of Gracie Mae Crawford.[6]  According to

Petitioner, DiMarino went to trial separately and was convicted of a lesser charge, and

he agreed to testify against Petitioner and Mr. Smith in order to receive a benefit from

the State.[7]  Petitioner states that DiMarino's reasons for agreeing to testify were not fully

disclosed by the State and that, during the trial, the State elicited information from

DiMarino that was false.  Petitioner also mentions that a statement by Ann Hicks was

withheld from his trial counsel. In the statement, Hicks allegedly told detectives that the

victim stated that she feared the Outlaws because she knew they had recently killed

another woman.  *See* E-12 at 40.  The victim mentioned several individuals in the

Outlaw gang that she feared, and Hicks wrote down those names; however, there was

no mention of Petitioner, and he was not listed.

Petitioner argued in his first motion for postconviction relief that the State failed

to disclose evidence that would have impeached the credibility of DiMarino.  Ex. E-6 at

491-92.   The undisclosed evidence included that charges were dropped (or

compromised to no additional time of incarceration), that the State agreed not to pursue

enhanced penalties for any pending charges, and that the State paid DiMarino's fiancé

---

[6]Petitioner had the nickname "Snivelhead," Richard DiMarino had the nickname
"Dino," and Guy Ennis Smith had the nickname "Wolf."  *See* Ex. A-2 at 283; Ex. A-3 at
405, 416, 465, 477, 482.  These individuals were all members of the "Outlaws" gang, *see*
Ex. A-2 at 294-98, Ex. A-3 at 406-08,  and they were identified by these nicknames
during trial.  The victim also went by the name "Rose."  Ex. A-3 at 410, 474.

[7]Richard DiMarino will be referred to as "DiMarino."   His brother, John
DiMarino, who will be mentioned in this Order, will be referred to as "John DiMarino."

$1000 to enable her to move to the State where DiMarino would be incarcerated.

Petitioner cited to *Giglio* and *Brady*.

The trial court held an evidentiary hearing on the postconviction motion and

denied this claim.  The trial court found, in relevant parts, as follows:

> [D]efense counsel conducted an excellent cross-examination of DiMarino.
> White's attorney showed the jury that DiMarino had much to gain by his
> testimony.  Defense counsel brought out that DiMarino lied when it was
> to his benefit, that he obtained a better sentencing deal via his testimony,
> that he would be kept safe from the Outlaws and that his girlfriend and
> child would be taken care of.  Even though some of the details of the
> agreement were not presented to the jury, counsel more than sufficiently
> acquainted the jury with the fact that there was an agreement between
> DiMarino and the State and counsel introduced most of the agreement's
> major components.  The additional material of which Defendant now
> complains would not have added to DiMarino impeachment.
> Consequently, this court finds there is no reasonable probability that this
> evidence, if it had been presented at trial, would have changed the
> outcome.

*See* E-8 at 1068-69.   As to Hicks' statement, the trial court found that this evidence did

not meet the test for materiality.  Her "statement indicated that the victim was afraid of

certain members of the Outlaws, which she listed by name.   Allegedly Defendant's

name was not on that list.   Merely because the victim was allegedly unafraid of

Defendant, does not mean that he did not kill her.  There is simply no possibility that

this evidence would have altered the outcome of the trial, especially in light of

DiMarino's testimony."  *Id.* at 1069.

Petitioner raised this issue on appeal of the denial of his postconviction motion.

As to the State's failure to disclose details of the deal with DiMarino, the Supreme Court

of Florida agreed with the trial court's analysis regarding the materiality of the evidence

and found "that the cumulative effect of the State's failure to disclose the [evidence did] not undermine our confidence in the jury's conviction." *White v. State*, 720 So. 2d 909, 913 (Fla. 1999).  The Supreme Court of Florida did not find any error under *Brady* or *Giglio*.  As to the State's failure to disclose the statement of Hicks, the Supreme Court of Florida agreed with the trial court's analysis regarding the materiality of this evidence.

2.    *Analysis of Brady Claim*

Initially, the Court notes that Petitioner merely alleges in the instant habeas petition that DiMarino "agreed to testify . . . in order to receive a benefit from the state" and that the reasons for his decision to testify were not fully disclosed to his counsel as required by *Brady*.  *See D*oc. No. 1 at 5.  Petitioner provided no further facts or legal argument in support of his claim.  In an abundance of caution, the Court will review the more specific factual and legal argument raised by Petitioner in the state courts with regard to this matter.

Here, Petitioner claims that the State did not meet its *Brady* obligations in failing to disclose the following:  (1) the State agreed not to seek enhanced punishment although DiMarino qualified as a habitual offender and to drop other charges; (2) a $1,000 payment to DiMarino's wife (girlfriend) to enable her to move to the State where DiMarino would be incarcerated; and (3) the statement of Hicks.  *See* E-6 at 492.

"*Brady* requires the state to disclose material exculpatory evidence in its possession.  The duty to disclose required by *Brady* includes the disclosure of evidence that may be used for impeachment purposes and evidence that may be used to attack the thoroughness and even the good faith of the investigation[.]"  *Consalvo v. Secretary*

11

*for Department of* Corrections, 664 F.3d 842, 844-45 (11th Cir. 2011) (quotation omitted) (citations omitted).  To obtain relief on his *Brady* claim, Petitioner must "establish (1) the government possessed evidence favorable to him; (2) the defendant did not possess the evidence and could not have obtained it with reasonable diligence; (3) the government suppressed the favorable evidence; and (4) the evidence was material."  *Lamarca v. Sec'y, Dep't of Corr.*, 568 F.3d 929, 941 (11th Cir. 2009) (quotation omitted).  "Evidence would be material if it is reasonably probable that a different outcome would have resulted if the government had disclosed the evidence.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Ferguson v. Sec'y for the Dep't of Corr.*, 580 F.3d 1183, 1205–06 (11th Cir.2009) (quotations and citation omitted).[8]

With respect to the State's agreement with DiMarino and the payment to DiMarino's girlfriend, the trial court found, and the state supreme court affirmed, that this evidence was not material.  Petitioner's counsel conducted a thorough cross-examination of DiMarino, and counsel showed the jury that DiMarino had much to gain by his testimony.  Petitioner's counsel brought out many matters regarding the benefits provided to DiMarino and his propensity to tell lies.

---

[8]*Giglio* is closely related and dictates that the presentation of known false evidence violates due process and is 'incompatible with rudimentary demands of justice.'"  *Consalvo*, 664 F.3d at 845.  Further, as will be discussed, *Giglio* requires a *Brecht* analysis; however, "no *Brecht* analysis is needed for *Brady* violations, for the Supreme Court has held that a showing of materiality under *Brady* necessarily establishes actual prejudice under *Brecht*.  *Trepal v. Sec'y, Florida Dept. of Corr.*, 684 F.3d 1088, 1112 (11th Cir. 2012).  In particular "a *Brady* error cannot be harmless under *Brecht* because 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different' necessarily entails the conclusion that the suppression must have had 'substantial and injurious effect or influence in determining the jury's verdict.'"  *Id.* at 1113 (quotation omitted) (citation omitted).

DiMarino admitted that he was "prone to tell lies" and that he only told the truth when it "suits his fancy."  *See* A-3 at 505-06.  In addition, DiMarino testified that he received a substantial sentencing benefit and immunity as a result of his testimony.  *Id.* at 506-07, 527; A-4 at 664-65.  Further, DiMarino and his girlfriend had been threatened, and the State agreed to send DiMarino to a prison out-of-state and to "take care of" DiMarino's child and girlfriend.  *Id.* at 508, 516-18; A-4 at 664.  It was also revealed that DiMarino had been arrested numerous times and convicted of between 5 and 10 felonies.  A-4 at 657-58, 674.  The jury was informed that the felonies included robbery, rape, kidnapping, carrying a concealed weapon, the murder charge in the instant case, a drug charge, and disorderly conduct charges.  *Id.* at 675.

Clearly, the jury was aware that DiMarino had entered into an agreement with the State, which involved a substantial sentencing benefit, immunity, and the State taking care of DiMarino's girlfriend and child.  The jury was also aware that DiMarino had been convicted of multiple felonies and was prone to tell lies.

Any omissions regarding DiMarino's agreement with the State had, at most, a very slight effect on the jury's verdict.  Here, Petitioner has not shown that it is reasonably probable that a different outcome would have resulted with the disclosure of these other matters.  Consequently, the Court finds that Petitioner has failed to demonstrate materiality under *Brady*.

Likewise, Petitioner has not shown that it is reasonably probable that a different outcome would have resulted with the disclosure of Hicks' statement (*i.e.*, that it was material).  Merely because the victim did not fear Petitioner did not mean that he did

not murder her.  In fact, the victim correctly predicted her own death at the hands of the Outlaws, a gang to which Petitioner belonged.  Thus, the admission of this statement could have actually harmed Petitioner, not helped him.

In addition, there was testimony that Petitioner was not a member of the Orlando chapter of the Outlaws; rather, he was a member of the Louisville chapter of the Outlaws and was "just visiting" the Orlando chapter.  *See* Ex. A-2 at 294; Ex. A-4 at 607.  Consequently, Petitioner's exclusion from Hicks' list may not have been significant, particularly when it is not clear how well Petitioner and the victim knew each other prior to the murder.  As a result, the significance of this matter is highly speculative.

Under the circumstances, the Court finds that the state court's rejection of this issue does not reflect an unreasonable determination of the facts, nor was it contrary to, or an unreasonable application of, federal law.

3.    *Analysis of Giglio Claim*

Petitioner argues that DiMarino testified falsely and that the State was aware of the false testimony.  Doc. No. 1 at 5.  Petitioner provided no specifics in support of this claim; however, in the reply, Petitioner states that DiMarino "lied about his and the Petitioner's relative culpability and that he had been an active confidential informant for the State of Florida at the time of the Petitioner's trial."  Doc. No. 53 at 18.

In *Giglio*, the Supreme Court held that, when the prosecution solicits or fails to correct known false evidence, due process requires a new trial when "the false testimony could in any reasonable likelihood have affected the judgment of the jury."

14

405 U.S. at 154 (quotation and citation omitted) (ellipsis omitted). "*Giglio* error is a species of *Brady* error that occurs when the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury." *Ventura v. Attorney Gen., Fla.*, 419 F.3d 1269, 1276-77 (11th Cir. 2005) (quotation and citation omitted). A habeas petitioner must establishing the following: "(1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material, i.e., that there is any reasonable likelihood that the false testimony could have affected the judgment." *Guzman v. Sec'y, Dept. of Corr.*, 663 F.3d 1336, 1348 (11th Cir. 2011) (quotation omitted) (citation omitted) (ellipsis omitted).

"The *Giglio* materiality standard is `different and more defense-friendly' than the *Brady* materiality standard." *Trepal v. Sec'y, Florida Dept. of Corr.*, 684 F.3d 1088, 1108 (11th Cir. 2012). As to *Brady* violations, "the defendant must show a reasonable probability the result would have been different, but for *Giglio* violations, the defendant has the lighter burden of showing that there is any reasonable likelihood that the false testimony could have affected the jury's judgment. The *Brady* materiality standard is substantially more difficult for a defendant to meet than the 'could have affected' standard under *Giglio*." *Id.* (quotation and citation omitted). Further, since *Giglio* error is trial error, when considering a *Giglio* claim, relief can be granted only when "(1) the petitioner establishes that a *Giglio* error occurred, and (2) that error had 'substantial and injurious effect or influence in determining the jury's verdict.' *Brecht* [*v. Abrahamson*], 507 U.S. [619], 637 [1993]." *Id.* at 1112.

15

DiMarino stated at trial that he, Petitioner, Guy Enis Smith ("Wolf") and the victim were in the kitchen.[9]   A-3 at 476-77.   He and Petitioner did not like certain comments made by the victim, and, as a result, DiMarino admitted that he and Petitioner "smacked" the victim in the face.   *Id*.   Petitioner and Wolf continued to "beat up [the victim] pretty bad," and, a short time later, DiMarino, Petitioner, and the victim, who was still alive, left the house and drove to a deserted road where they all exited the vehicle.   *Id*. at 477-87.   DiMarino and Petitioner then helped the victim get over a fence, where she fell down and was "laying on the ground face up."   *Id*. at 487-90.   Petitioner pulled out his knife, straddled the victim, and then stabbed her repeatedly.   *Id*. at 490. DiMarino admitted that he and Petitioner both cut the victim's throat.   *Id*. at 491-92. DiMarino's testimony implicated himself in the murder and showed that he was actively involved in the victim's murder.

DiMarino also admitted that he knew Detective Jim Holloman and that he had known Detective Holloman "for some time prior to the" crime.   *Id*. at 509.   DiMarino denied being a confidential informant, but Petitioner's counsel introduced deposition testimony of Detective Holloman in which the detective stated that DiMarino was a confidential informant.   *Id*. at 514.   In response, DiMarino stated that he had "done something" for Detective Holloman but that he actually "ran a skam [sic]" on the detective.   *Id*. at 515. DiMarino stated that he "tricked" the detective in order to "make

---

[9]The kitchen was inside a house located on Surfside Way in Orange County, Florida.  Ex. A-2 at 280-81.  The house served as clubhouse for the Outlaws.  Ex. A-3 at 406.   The house belonged to Joseph Watts ("Wildman"), a member of the Orlando chapter of the Outlaws, and Julie, his girlfriend or wife.  Ex. A-2 at 297.

money."  *Id.*   Clearly, the jury was aware that DiMarino was some kind of informant for law enforcement.

Petitioner has not shown conclusively that perjury occurred.  Further, he has not shown that the prosecutor suborned perjury.  Moreover, if any falsities in DiMarino's testimony had any effect at all upon the jury's verdict, it was very slight.  Assuming without deciding that DiMarino's testimony was improper, it certainly did not have, as the *Brecht* test requires, "a substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 623.  Even assuming *arguendo* that Petitioner could establish a *Giglio* violation, it was harmless.  Accordingly, Petitioner is not entitled to habeas relief.

Under the circumstances, it cannot be said the decision of the state courts with regard to this matter was contrary to, or involved an unreasonable application of, clearly established federal law, or resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

**B.**  **Claim Two**

Petitioner asserts that newly discovered evidence exculpates him from the murder.  Petitioner states that Frank Marasa, a member of the Outlaws, heard DiMarino state, the day after the victim's murder, that he had to "get rid of a girl last night." According to Petitioner, DiMarino was holding a woman's wig at the time he made this statement.

This claim was raised in the motion for postconviction relief filed by Petitioner after his resentencing.  The trial court found that the claim was procedurally barred.  According to the trial court, Petitioner "failed to explain why his proposed witness, Frank Marasa, could not have been discovered by diligent efforts either prior to trial, in preparation of his 1983 postconviction motion, or through an amendment to his 1983 postconviction motion."  Ex. H-2 at 217.  The trial court also found that Petitioner did not prevail on either prong of the newly discovered evidence test.  *Id.*

The Supreme Court of Florida found that newly discovered evidence claims could be raised in successive postconviction motions but that the alleged evidence did not meet either prong of the newly discovered evidence test.  *White*, 964 So. 2d at 1285.

The function of a federal habeas corpus court is to redress constitutional errors, not to relitigate state criminal cases.  *Herrera v. Collins*, 506 U.S. 390, 401 (1993).  Consequently, "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  *Id.* at 400.  A claim of actual innocence is not normally used as a freestanding basis for habeas relief, but rather as a reason to excuse the procedural default of an independent constitutional claim.  *Id.* at 404.  Nevertheless, in *Herrera*, the Supreme Court assumed, "for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim."  *Id.* at 417.

18

The Eleventh Circuit Court of Appeals in *Mize v. Hall*, 532 F.3d 1184, 1195 (11th Cir. 2008) discussed the standard of review:

> The Supreme Court, of course, has never decided what the precise burden of proof for a freestanding actual innocence claim would be. However, the Court has indicated that it would necessarily be more difficult to establish a freestanding actual innocence claim than it is to establish actual innocence under the fundamental miscarriage of justice exception to the procedural default doctrine. *See House v. Bell*, 547 U.S. 518, 126 S. Ct. 2064, 2087, 165 L.Ed.2d 1 (2006). To satisfy this lesser standard (which itself applies "only in the extraordinary case," *House*, 126 S. Ct. at 2077), Mize would have to demonstrate that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 327, 115 S. Ct. 851, 867, 130 L.Ed.2d 808 (1995). In other words, he would have to show it is probable that, given the new evidence, no reasonable juror would have convicted him.

Petitioner's new evidence does not establish freestanding actual innocence. As discussed above, DiMarino testified that he struck the victim in the kitchen, that he helped take the victim to the deserted area where she was killed, that he helped her over the fence, and that he cut her throat. DiMarino's alleged statement to Marasa the day after the murder that "he had to get rid of a girl last night" was not inconsistent with DiMarino's trial testimony and does not exculpate Petitioner.

Further, DiMarino's brother, John DiMarino, testified that he spoke with DiMarino the day after the murder and that DiMarino told him that "he had to take care of some business the night before, which was the girl you mentioned. I know her by Rose, don't remember her real name." Ex. A-4 at 605. John DiMarino also stated that DiMarino told him that he (DiMarino) "had slit her throat and stabbed her." *Id*. at 605. Thus, the jury heard evidence that DiMarino made a statement the day after the murder regarding "taking care of business" as it related to the victim and slitting her throat.

Under the circumstances, Marasa's statement was cumulative of the testimony of John DiMarino.  As a result, the Court concludes that it is not probable that no reasonable juror would have convicted Petitioner based on Marasa's statement.  Upon the record, Petitioner fails to meet the "extraordinarily high" threshold that a freestanding claim of actual innocence must have.

Moreover, Petitioner does not adequately explain the delay in discovering this evidence.  It does not appear that he had been in any manner precluded from discovering this evidence over the many years between his conviction and the filing of his second motion for postconviction relief.  Thus, Petitioner has not shown that this claim was pursued with due diligence or that, in fact, it was new evidence, as opposed to old evidence only recently discovered because of a lack of due diligence.

Under the applicable AEDPA standards, Petitioner is not entitled to habeas relief.  The ruling of the state courts on Petitioner's claim regarding his newly discovered evidence/actual innocence was not contrary to, or an unreasonable application, of clearly established federal law.  Nor was the ruling based on an unreasonable determination of the facts.

## C.    Claim Three

Petitioner argues that his constitutional rights were violated when a juror at resentencing was struck based solely on the fact that English was not her primary language.  This claim was raised in the motion for postconviction relief filed by

Petitioner after resentencing (claim eight).[10]  Ex. H-1 at 35.  The trial court denied the claim because the juror indicated that "her feelings about the appropriateness of the death penalty would interfere with her ability to participate as a part of the jury that would make the sentencing decision and that she did not believe she could do it."  Ex. H-2 at 227.  On appeal, the Supreme Court of Florida affirmed, determining that to "the extent that White raises a substantive claim on this juror's excusal, that claim is procedurally barred because it should have been raised on direct appeal."  *White*, 964 So. 2d at 1290.[11]

The federal court must dismiss those claims or portions of claims that either (1) have been explicitly ruled procedurally barred by the highest state court considering the claims, or (2) are not exhausted but would clearly be barred if returned to state court.  Thus, "[f]ederal courts are precluded from addressing claims that have been held to be procedurally defaulted under state law.  In addition, federal courts may not address claims that have not been presented in state court if the state court would have found the claims to be procedurally defaulted . . . ."  *Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993).

---

[10]Petitioner also argued in a separate claim (claim seven) in his postconviction motion that counsel was ineffective for agreeing to strike a prospective juror because English was not her primary language.  Ex. H-2 at 26.  In the present case, Petitioner did not argue that counsel was ineffective with regard to this matter.

[11]The Supreme Court of Florida also found "that counsel was not ineffective because the prospective juror clearly stated on the record that she did not think that she could follow the law were she to serve on the jury."  *White*, 964 So. 2d at 1290.

This claim is procedurally barred because the Supreme Court of Florida so determined in its opinion affirming the denial of Petitioner's motion for postconviction relief.  There are two exceptions to the procedural default bar.  First, a petitioner may overcome a procedural default by showing "both 'cause' for the default and actual 'prejudice' resulting from the default."  *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003).  The second exception, known as the "fundamental miscarriage of justice," only "occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent."  *Id*.

In the present case, Petitioner has neither alleged nor shown either cause or prejudice that would excuse the default.  Likewise, Petitioner has neither alleged nor shown the applicability of the actual innocence exception.  A review of the record reveals that the Petitioner is unable to satisfy either of the exceptions to the procedural default bar.  Therefore, this claim is denied.

Alternatively, this claim is denied on the merits.  The record refutes the assertion that Ms. Fuentes (the prospective juror) was struck solely on the basis that she was having language difficulties.  During voir dire, she indicated that she believed that life in prison was more severe punishment than a death sentence.  Ex. F-1 at 91-92.  Fuentes stated that her feelings about the appropriateness of the death penalty would interfere with her ability to make a sentencing decision and that she did not believe she could make a decision regarding a death sentence.  *Id*. at 93.  Fuentes also stated that she was a "Christian person" and that "my beliefs would be because one of the commandments is thou should not kill somebody.  This guy killed somebody.  The law here in this

world is different.  Right, you kill, we have to kill you."  *Id.* at 97.  When asked if she would have the courage to "stick by her vote" no matter what, Fuentes stated "Well, I don't know what to say."  *Id.* at 95.

 "The test for determining juror competency is whether a juror can lay aside any bias or prejudice and render a verdict solely on the evidence presented and the instructions on the law given by the court.  A juror must be excused for cause if any reasonable doubt exists as to whether the juror possesses an impartial state of mind." *Ault v. State*, 866 So. 2d 674, 683 (Fla. 2003) (citations omitted).  Moreover, an individual may not serve as a juror in a capital case if his or her views on the death penalty "prevent or substantially impair the performance of his or her duties as a juror in accordance with the juror's instructions or oath."  *Fernandez v. State*, 730 So.2d 277, 281 (Fla. 1999).

In the present case, the record reveals Fuentes did not think she could follow the law were she to serve on the jury.  Further, her views on the death penalty would have prevented or substantially impaired her ability to act in accordance with the instructions of the court and her oath as a juror.  Her remarks cast a broad shadow of doubt on her ability to be fair and impartial.  As a result, her dismissal was proper, and this claim is without merit.[12]

---

[12]In addition, Petitioner has failed to demonstrate that the decision of the state courts in rejecting this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

D.     **Claim Four**

Petitioner claims that counsel was ineffective for failing to call Joseph Watts and Mark Markham as witnesses during the resentencing proceedings.  Petitioner states that Watts would have testified that DiMarino had confessed the murder to him, and he would have supported the evidence of Petitioner's alcoholism and impaired mental state.  Petitioner states that Markham was his co-defendant in the Tennessee homicide case, and he would have testified that, while Petitioner was present, Petitioner did not participate in the killing.[13]  Petitioner raised this claim in his motion for postconviction relief, filed after resentencing (claims three and five).

The trial court denied the Watts issue because of the following:  the issue was speculative; the testimony would have been consistent with DiMarino's testimony and cumulative to other evidence; and it was unlikely that the testimony would have resulted in a recommendation of life.  Ex. H-2 at 219.  The trial court denied the Markham issue because of the following:  counsel had investigated Markham; counsel did not believe Markham was credible; counsel believed that calling more "Outlaws" as witnesses would be damaging to the defense; and counsel made the decision to present Markham's testimony at the *Spencer* hearing.  *Id*. at 222-24.  On appeal, the Supreme Court of Florida affirmed, determining that Watts' testimony was consistent with DiMarino's testimony at the guilt and resentencing phases of the trial and that Watts

---

[13]As previously discussed, one of the aggravating factors was that Petitioner was previously convicted of another felony involving the use or threat of violence to the person.  Petitioner was convicted of the second degree murder of Jim Valentino in Tennessee.

was described by counsel as unpredictable and uncontrollable. *White*, 964 So. 2d at 1286. The Supreme Court of Florida also found that resentencing counsel made a reasonable, tactical decision after full investigation not to call Markham before the jury. *Id*. at 1287-88.

1.    *Testimony of Watts*

According to Petitioner, "Watts' testimony was that Richard DiMarino had confessed the murder to him," and his testimony "would have cast a shadow on the State's theory of the case that William White had killed [the victim] by impeaching DiMarino's testimony regarding their respective roles and by demonstrating the likelihood that DiMarino directed and conducted the killing of [the victim]." Doc. No. 53 at 25-26.

The proposed testimony of Watts would have been consistent with DiMarino's proposed testimony and cumulative to other evidence presented at the resentencing proceeding. At the resentencing proceeding, DiMarino testified that he drove the vehicle that took the victim to the location where she was murdered, that he assisted the victim to the area where she was murdered, that he slit the victim's throat (after Petitioner had done so), and that he was convicted of third degree murder for his involvement in the crime. *See* Ex. F-7 at 919, 922, 924, 930, 958. Further, John DiMarino's 1978 guilt phase testimony was published to the jury, and John DiMarino testified that the day after the murder his brother, DiMarino, told him that "he had to take care of some business the night before," that "he had slit her throat and stabbed her," and that Petitioner "drinks a lot." *Id*. at 1058, 1061.

25

In addition, it does not appear that Watts' testimony would have been beneficial because, at the *Spencer* hearing, Watts testified that he believed DiMarino's motivation for telling him that he had killed the victim was "to brag." Ex. F-16 at 133. Watts specifically described DiMarino as wanting "to brag, you know. He thought he was Mr. Everybody." *Id*. DiMarino's propensity to brag casts doubt as to the credibility of his statement to Watts, and it is unlikely that this testimony would have changed the outcome of the jury's sentencing recommendation. Moreover, Watts never testified (and Petitioner has never so indicated) that DiMarino stated that Petitioner did not participate in the murder or that Petitioner did not inflict the fatal wound and other wounds.

Further, Petitioner's counsel, Chandler Muller, testified at the evidentiary hearing on the motion for postconviction relief that he did not call Watts as a witness because "he was totally unpredictable and uncontrollable." Ex. H-1 at 151. Muller was also concerned about presenting the testimony of witnesses, *i.e.*, members of the Outlaws, "who the prosecution might be able to paint in an extremely unsympathetic light." *Id*. at 152. Co-counsel, Bryan Park, testified that it was his opinion (and that of Mr. Muller) that the more "Outlaws" they called as witnesses, the more damaging it would be to the defense. Ex. H-2 at 204. According to Park, "there was the chance of [Petitioner] getting dirty just by association." *Id*.

As a result, Petitioner has failed to advance a persuasive argument that the failure to call Watts was an unreasonable decision by counsel or that this decision can be construed as conduct outside the wide range of professional representation.

Additionally, in light of the discussion above, it is apparent that Petitioner has failed to demonstrate prejudice.  The testimony of Watts would have been cumulative and would not have been beneficial.  Further, it is apparent that this testimony would not have changed the outcome of the proceedings.  Therefore, this issue is without merit.

2.      *Testimony of Markham*

According to Petitioner, Markham would have testified that, while Petitioner was present during the Tennessee homicide, Petitioner "did not participate in the killing and only helped Markham in getting rid of the body."  Doc. No. 53 at 26.

Markham testified at the *Spencer* hearing.  He stated that he committed the Tennessee homicide and that, while Petitioner was present, Petitioner did not participate in the killing; rather, Petitioner only assisted Markham in getting rid of the body.  Ex. F-16 at 110-12.

Muller was well-aware of Markham, and he carefully considered whether to present him as a witness during the jury portion of the resentencing.  Chris Cox, an investigator working on the case with Muller, met with Markham prior to resentencing, and Cox and Muller discussed the details of the meeting.  Ex H-1 at 113, 124, 178. Muller himself also met with Markham and discussed the specifics of the Tennessee homicide.  *Id*. at 118.  Muller even listed Markham as a potential witness, arranged for him to travel down to Florida for the resentencing trial, and kept Markham around during the proceedings.  *Id* at 120, 131, 167-68.

Ultimately, after thorough investigation and consideration, Muller decided that "it would help Mr. White to have Mr. Markham's testimony for probably a host of

reasons in front of the Judge" and not the jury. *Id*. at 136. Muller was "worried" about Markham: "The reason I didn't call Mr. Markham, something bothered me and I can't, you know my best recollection is that it was because he was going to get up there and say he shot this guy and that there was the plea colloquy. And my focus in this case was all the stuff that Mr. White went through in his life, and, you know, the other evidence that we presented at trial." *Id*. at 140. Muller was also concerned that Markham's testimony would conflict with the autopsy report and his plea. *Id*. at 118. In particular, Markham stated that he alone shot the victim; however, the autopsy report did not reflect any gunshot wounds, only stabbing wounds. *Id*.

Ultimately, Muller "didn't want to focus" on the Tennessee homicide; instead, his focus at resentencing was to present the mitigating circumstances of Petitioner's "horrible" childhood. *Id*. at 116-17. Muller reiterated that "I wanted the Judge to hear what [Markham] had to say, but I didn't want the jury to." *Id*.

Park testified that he met with Markham and that Cox had a lot of contact with Markham. *Id*. at 192, 197. Markham was concerned about having to answer questions unrelated to the Tennessee homicide and being badgered on cross-examination. Ex. H-2 at 203-04. Park was also concerned about having too many Outlaws testify because Petitioner could get "dirty just by association." *Id*. at 204.

It was reasonable trial strategy for counsel not to present the testimony of Markham to the penalty-phase jury, but to instead present his testimony at the *Spencer* hearing. Muller thoroughly investigated this matter, and he did not believe Markham would make a good witness. Moreover, Muller wanted to focus on other mitigating

evidence and not on the Tennessee homicide.  Muller arranged for Markham to come to Florida to testify, and Markham would have been available if needed.  Ultimately, Muller decided not to present Markham's testimony to the jury.  Muller's strategic decision not to present Markham's testimony after a full investigation was reasonable, and there has been no showing that counsel acted in any manner deficiently with regard to this matter.  Further, there has been no showing of prejudice.

Under the circumstances, as to both of these issues, Petitioner has not shown that the state court determinations have resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.  Thus, Petitioner is not entitled to relief with regard to these issues.

## V.   CONCLUSION

The Court finds that the claims raised in the instant petition are without merit and must be denied with prejudice.

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1.   The Petition for Habeas Relief filed by William Melvin White (Doc. No. 1) is **DENIED**.

2.   The Clerk of the Court shall enter judgment accordingly and close this case.

29

3.      This Court should grant an application for certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Petitioner has failed to make a substantial showing of the denial of a constitutional right.  Accordingly, a Certificate of Appealability is **DENIED** in this case.

**DONE AND ORDERED** in Orlando, Florida, this  11th day of March, 2014.


Charlene Edwards Honeywell
United States District Judge


Copies to:
OrlP-2 3/11
Counsel of Record